IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

ELYCE   JENNINGS   and   KEVIN
JENNINGS,

    Plaintiffs,

       v.

THE TJX COMPANIES, INC. and
HOMEGOODS, INC.,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \*

SEP 20 2024

**FILED**

CV 122-035

---

**O R D E R**

---

Before the Court are Plaintiffs' motion to exclude the opinion testimony of Ian Campbell, Ph.D., P.E. ("Dr. Campbell") (Doc. 37); Plaintiffs' motion for sanctions (Doc. 39); Defendants' motion to exclude certain opinions of Les Winter ("Mr. Winter") (Doc. 46); Defendants' motion to exclude opinions of Harriet Fowler ("Ms. Fowler") (Doc. 47); Plaintiffs' motion for partial summary judgment (Doc. 48); and Defendants' motion for summary judgment (Doc. 50). For the following reasons, Plaintiffs' motion to exclude Dr. Campbell's opinion testimony (Doc. 37) is **DENIED**; Plaintiffs' motion for sanctions (Doc. 39) is **GRANTED IN PART AND DENIED IN PART**; Defendants' motion to exclude Mr. Winter's opinion testimony (Doc. 46) is **GRANTED IN PART AND DENIED IN PART**; Defendants' motion to exclude Ms. Fowler's opinion testimony (Doc. 47) is **DENIED AS MOOT**; Plaintiffs' motion for partial summary

judgment (Doc. 48) is **GRANTED IN PART AND DENIED IN PART**; and Defendants' motion for summary judgment (Doc. 50) is **GRANTED IN PART AND DENIED IN PART.**

## I. BACKGROUND

This case arises out of an incident at the HomeGoods retail store in Augusta, Georgia (the "Store") that occurred on March 7, 2020, where Plaintiff Elyce Jennings ("Mrs. Jennings") fell when a chair broke while she tried to sit in it. (Doc. 50-1, ¶ 1; Doc. 62-1, ¶ 1.)

Defendant HomeGoods, Inc. ("HomeGoods") is a wholly owned subsidiary of Defendant the TJX Companies, Inc. ("TJX"). (Doc. 9, at 1-2.) Matthew Garvey ("Mr. Garvey"), TJX's vice president of risk and compliance, testified that Defendants own a license from Nautica that gives them the right to sell and brand Nautica goods. (Doc. 50-16, at 27-28, 64-65; Doc. 62-1, ¶ 16.) In August 2019, Defendants ordered chairs, including the chair involved in Mrs. Jennings's fall (the "Subject Chair"). (Doc. 62-17, at 1-2; Doc. 50-16, at 39.) The chairs were purchased from DI BI CO LTD, one of Defendants' Vietnam vendors (the "Vietnamese Manufacturer"). (Doc. 50-1, ¶ 13; Doc. 62-1, ¶ 13.) The chairs, including the Subject Chair, contained a Nautica branded tag and a HomeGoods price tag listing the chair for $129.99. (Doc. 50-1, ¶ 16; Doc. 62-1, ¶ 16.)

2

Defendants have policies to determine whether the price of damaged merchandise should be discounted or "marked down" ("Price-Point Inspection"). (Doc. 50-1, ¶ 24; Doc. 62-1, ¶ 24.) Under these policies, the price of merchandise with minor damage is reduced by 10%, the price of merchandise with moderate damage is reduced up to 28.8%, and any merchandise with damage such that it should be reduced by more than 28.8% is to be purged or destroyed. (Doc. 62-1, ¶ 17.)

At an unknown date, the Subject Chair arrived at the Store and, after being unboxed and unsealed, was processed in the Store's back room. (Doc. 50-1, ¶ 14; Doc. 62-1, ¶ 14; Doc. 62-6, at 56.) Before being put out on the sales floor, Defendants' employees visually inspected the Subject Chair and discovered the back right leg was chipped (the "Cosmetic Defect"). (Doc. 62-1, ¶ 20; Doc. 43-2, at 60.) Patrick Simons ("Mr. Simons"), the Store's manager, testified that he marked the Subject Chair's price down from $129.99 to $100.00 because of the Cosmetic Defect. (Doc. 43-2, at 65, 89, 111.) The reduced price was shown with a red price sticker, and an employee wrote "as is" on the price tag, indicating the Subject Chair would not be marked down any further. (Doc. 50-1, ¶ 19; Doc. 62-1, ¶ 19.) Mr. Simons then looked at the Subject Chair again, put it on a cart, and took it to the sales floor. (Doc. 50-1, ¶ 20; Doc. 62-1, ¶ 20.)

On March 7, 2020, Plaintiffs shopped at the Store. (Doc. 50-1, ¶ 1; Doc. 62-1, ¶ 1.) Upon entering the Store, Plaintiffs split up, and Plaintiff Kevin Jennings ("Mr. Jennings") found a chair to sit in while Mrs. Jennings shopped. (Doc. 50-1, ¶ 3; Doc. 62-1, ¶ 3.) After browsing the store for ten to fifteen minutes, Mrs. Jennings received a text message from Mr. Jennings to come look at some chairs. (Doc. 50-1, ¶¶ 4-5; Doc. 62-1, ¶¶ 4-5.) When Mrs. Jennings approached the chairs, Mr. Jennings asked her to sit in the Subject Chair. (Doc. 50-1, ¶ 7; Doc. 62-1, ¶ 7.) When Mrs. Jennings sat down in the Subject Chair, its back right leg broke, and she fell to the floor (the "Subject Incident"). (Doc. 50-1, ¶¶ 7, 9; Doc. 62-1, ¶¶ 7, 9.) Plaintiffs' expert, Mr. Winter, opined the Subject Chair's leg broke because the Vietnamese Manufacturer did not sufficiently apply adhesive to the mortise-and-tenon joint (the "Physical Defect"). (Doc. 50-1, ¶¶ 29-30; Doc. 62-1, ¶¶ 29-30.) After the fall, Mrs. Jennings located Mr. Simons, who looked at the Subject Chair and, together with Mrs. Jennings, filled out an incident report. (Doc. 50-1, ¶ 10; Doc. 62-1, ¶ 10.) Mrs. Jennings decided she did not need medical assistance and left the Store fifteen to twenty minutes later. (Doc. 50-1, ¶ 11; Doc. 62-1, ¶ 11.)

According to Mr. Simons, he reported the Subject Incident to Defendants' insurance carrier the same day it occurred. (Doc. 43-2, at 76-77, 80.) Mr. Simons represents that, under the insurance

4

carrier's direction, he put the Subject Chair and its broken leg in a box and moved it to the Store's loss prevention office. (Id. at 81, 83.)   Mr. Simons testified that all the Subject Chair's legs were present when he placed it in the Store's loss prevention office. (Id. at 82-83.)   Defendants represent the box containing the Subject Chair and its broken leg was later sent from the Store to Defendants' insurance carrier. (Doc. 43, at 4 (citing Doc. 43-2, at 76-77, 80-81.)   At some point later, the Subject Chair's broken leg went missing. (Doc. 40-3, at 3; Doc. 43-2, at 82.)

After learning of the Subject Incident, Defendants' insurance carrier emailed Sheldon Childs ("Mr. Childs"), the Store's loss-prevention customer service associate, asking for video footage of the Subject Incident. (Doc. 40-7, at 19-20, 33.)   According to Mr. Childs, he reviewed the footage but discovered the Subject Incident occurred in one of the Store's blind spots. (Id. at 33-34.)   Mr. Childs testified that no one from the Store or its insurance carrier asked him to preserve the video footage from the day of the Subject Incident. (Id. at 41, 43.)   Under Defendants' retention policy, video footage of the Subject Incident would have been preserved for approximately nine to ten months. (Id.)   But once that time passed, Defendants' system would automatically purge or delete the footage. (Id.)   Because no one asked Mr. Childs to preserve the video footage from the date of the Subject Incident, it was deleted. (See id.; Doc. 40-3, at 3.)

On April 17, 2020, Plaintiffs sent Defendants a letter requesting they "preserve any and all records, note[s], [and] equipment, including the [Subject C]hair that was involved in the [Subject Incident]" (the "Preservation Letter"). (Doc. 40-1, at 1.) The Preservation Letter specified Plaintiffs were "asking that [Defendants] preserve any and all handwritten or electronic data related to the [Subject C]hair." (Id.) Defendants received the Preservation Letter on May 6, 2020. (Doc. 40-3, at 2.) However, as described above, Defendants did not preserve any video footage of the store from the date of the Subject Incident, nor did they preserve the Subject Chair's broken leg. (Id. at 3.)

Plaintiffs first filed suit in the State Court of Richmond County, Georgia on February 25, 2022, asserting two counts: (1) negligence and (2) strict products liability. (Doc. 1-2, at 1, 8–16.) Defendants removed the case to this Court on March 31, 2022, invoking the Court's diversity jurisdiction. (Doc. 1-1, at 1.) On October 20, 2023, Plaintiffs filed (1) a motion to exclude the testimony of Dr. Campbell; and (2) a motion for sanctions. (Docs. 37, 39.) On November 29, 2023, Defendants filed: (1) a motion to exclude certain opinions of Mr. Winter; (2) a motion to exclude opinions of Ms. Fowler; and (3) a motion for summary judgment. (Docs. 46, 47, 50.) The same day, Plaintiffs moved for partial summary judgment. (Doc. 48.)

The Court first addresses the Parties' motions to exclude (Docs. 37, 46, 47.) and then turns to the Parties' motions for summary judgment (Docs. 48, 50).   Finally, the Court considers Plaintiffs' motion for sanctions.   (Doc. 39.)

## II. MOTIONS TO EXCLUDE

Plaintiffs move to exclude the testimony of Defendants' expert, Dr. Campbell.  (Doc. 37.)  Defendants move to exclude (1) the testimony of Plaintiffs' expert, Mr. Winter, in part (Doc. 46); and (2) the testimony of Plaintiffs' expert, Ms. Fowler (Doc. 47).  The Court addresses these motions below.

### A. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579 (1993)], Rule 702 plainly contemplates that

7

the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003) (citations omitted). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citation omitted).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. The Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41 (citations omitted).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7

(S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. Daubert directs courts making such an assessment to consider four factors: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citations omitted). For example, experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from expert identifying firearms based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on

experience' rather than scientific methodology." <u>Summit at Paces,</u>
<u>LLC v. RBC Bank</u>, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D.
Ga. May 22, 2012) (quoting FED. R. EVID. 702 advisory committee's
note to 2000 amendment).   Bearing in mind the diversity of expert
testimony, "the trial judge must have considerable leeway in
deciding in a particular case how to go about determining whether
particular expert testimony is reliable." <u>Kumho Tire Co. v.</u>
<u>Carmichael</u>, 526 U.S. 137, 152 (1999).   "[W]hether the proposed
testimony is scientifically correct is not a consideration for
this court, but only whether or not the expert's testimony, based
on scientific principles and methodology, is reliable." <u>In re</u>
<u>Chantix Prods. Liab. Litig.</u>, 889 F. Supp. 2d 1272, 1280 (N.D. Ala.
2012) (citing <u>Allison</u>, 184 F.3d at 1312).   "Vigorous cross-
examination, presentation of contrary evidence, and careful
instruction on the burden of proof are the traditional and
appropriate means of attacking shaky but admissible evidence."
<u>Id.</u> (citations omitted and alterations adopted).

  Regardless of the specific factors considered, "[p]roposed
testimony must be supported by appropriate validation — i.e., 'good
grounds,' based on what is known." <u>Daubert</u>, 509 U.S. at 590.   "The
expert's testimony must be grounded in an accepted body of learning
or experience in the expert's field, and the expert must explain
how the conclusion is so grounded." FED. R. EVID. 702 advisory
committee's   note   to   2000   amendment   (citation   omitted).

"Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted and alterations adopted) (emphasis in original).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id.; Frazier, 387 F.3d at 1262. However, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted).

**B. Plaintiffs' Motion to Exclude Expert Testimony of Dr. Campbell**

Plaintiffs move, pursuant to Federal Rule of Evidence 702 and Daubert, to exclude the testimony of Dr. Campbell. (Doc. 37.)

11

Defendants responded in opposition, and Plaintiffs replied in support.  (Docs. 45, 54.)

Dr. Campbell is a professional engineer hired by Defendants to conduct a biomechanical investigation of the Subject Incident. (Doc. 45-3, at 1, 36.)  He has a B.A. in Physics and Mathematics from St. Olaf College and a Ph.D. in Biomedical Engineering from the Wallace H. Coulter Joint Department of Biomedical Engineering at the Georgia Institute of Technology and Emory University.  (Id. at 36-37.)  Dr. Campbell works for Exponent Engineering & Scientific Consulting, providing "technical expertise in injury biomechanics, injury tolerance, and human kinematics (motion), with a particular interest in ocular injuries, traumatic brain injuries, and orthopaedic and spinal injuries."  (Id. at 36.)

In his expert report, Dr. Campbell represents the Subject Incident "was evaluated from a biomechanical perspective to assess the kinematics (motions), biomechanical loading, and potential injury mechanisms experienced by an individual similar to Mrs. Jennings as a result of the [S]ubject [I]ncident."  (Id. at 13.) Dr. Campbell sought "to determine whether mechanisms were present in the [Subject Incident] to produce the type of spine pathologies documented in Mrs. Jennings' medical records by her treating medical providers."  (Id.)  Dr. Campbell provides:

> These evaluations were based on materials reviewed
> (listed [on pages one through three of his expert]
> report); fundamental laws of physics; principles of

12

kinematics; published biomechanical data involving volunteers, cadavers, and instrumented anthropomorphic test devices (ATDs) or "crash test dummies[";] studies of human tissue mechanics and response to the application of forces; biomechanical analyses utilizing models of the human body; relevant scientific literature; and [his] knowledge, education, and experience. The evaluation also involved a detailed review of the available medical records, including a review of radiology films with Harold Keyserling, M.D., a board-certified radiologist, and an inspection of the [S]ubject [C]hair on May 5, 2023.

(Id.) Dr. Campbell's report ultimately concludes that, "to a reasonable degree of scientific, engineering, and biomechanical certainty, the [Subject Incident] did not provide a mechanism for the pathologies or alleged injuries claimed by Mrs. Jennings to her cervical or lumbar spine beyond possibly transient strain or sprain." (Id. at 28.)

Plaintiffs move to exclude Dr. Campbell's expert testimony as unreliable, speculative, and conclusory. (Doc. 37, at 1; Doc. 38, at 4-5; Doc. 54, at 6-10.) First, Plaintiff's argue Dr. Campbell's methodology is unreliable because "he relied upon [Dr. Keyserling]'s opinions that were never disclosed and he failed to provide the basis for [Dr. Keyserling]'s conclusions." (Doc. 38, at 4-5.) Second, Plaintiffs argue Dr. Campbell's "methodology is unreliable as it cannot be tested." (Doc. 37, at 1; Doc. 38, at 6.) Third, Plaintiffs argue Dr. Campbell's methodology is unreliable and flawed because he failed to accurately apply his

opinions to the facts here.  (Doc. 54, at 8.)  The Court addresses each argument below.

### 1. Reliance on Consultation with Dr. Keyserling

Plaintiffs argue Dr. Campbell's reliance on a consultation with Dr. Keyserling, without offering the basis for his conclusions, makes his methodology unreliable, speculative, and conclusory.  (Doc. 37, at 1; Doc. 38, at 4-5; Doc. 54, at 6-7.) Plaintiffs contend that, while the radiology films of Mrs. Jennings's injuries themselves are objective facts on which Dr. Campbell may permissibly rely, Dr. Keyserling's interpretations of those films are Dr. Keyserling's "subjective opinions." (Doc. 54, at 6.)  Plaintiffs maintain that to properly rely on these opinions, Dr. Campbell would have had to provide the basis for them, which he did not do.  (Doc. 38, at 5.)  In essence, Plaintiffs argue the Court should exclude Dr. Campbell's expert testimony as unreliable because they "suspect[] and anticipate[] that Dr. Campbell will attempt to back door opinion testimony that he is unqualified to offer." (Doc. 54, at 9.)  In response, Defendants argue Dr. Campbell's consultation with Dr. Keyserling was not inappropriate and does not make Dr. Campbell's methodology unreliable because it was merely a "factual consultation" and "Dr. Campbell did not obtain any new . . . facts or opinions from [Dr. Keyserling]." (Doc. 45, at 7.)

The Court agrees with Defendants and will not exclude Dr. Campbell's testimony on this basis. As Plaintiffs point out, in his deposition, Dr. Campbell stated he relies on radiologists' interpretations of radiology films and does not personally review them because he is not qualified to do so. (Doc. 54, at 2 (citation omitted).) He explained that reviewing these scans was "a necessary component of [his] methodology" and he "rel[ies] on [the radiologist's] subjective opinions of the objective information in those diagnostic scans." (Doc. 38-4, at 40-41.) But, as Defendants point out, at the deposition, "Plaintiffs never (1) mentioned Dr. Keyserling, (2) asked what Dr. Campbell's review with Dr. Keyserling entailed, or (3) asked how Dr. Campbell relied on Dr. Keyserling." (Doc. 45, at 4 (citation omitted).)

In an affidavit, Dr. Campbell explains why he consulted Dr. Keyserling. (See Doc. 45-4.) Preliminarily, and relevant to his consultation with Dr. Keyserling, Dr. Campbell states his findings are based, in part, on Mrs. Jennings's medical records. (Id. ¶¶ 4, 7-10.) Dr. Campbell states that, with his training in anatomy and the physics of medical imaging, he can understand the findings in Mrs. Jennings's radiology reports without reviewing the radiological films. (Id. ¶ 7.) But Dr. Campbell consulted Dr. Keyserling "to visualize the pathologies and features identified in the text of the written radiology reports by Mrs. Jennings' treating physicians." (Id.) Moreover, Dr. Campbell consulted

15

with Dr. Keyserling because Dr. Keyserling "is qualified to review the medical imaging studies independently and because [Dr. Keyserling] could efficiently explain the findings documented in the written radiology reports . . . and visually identify these pathologies within the radiological imaging." (Id.)  Dr. Campbell represents he learned no new information beyond what was contained in the written radiology reports within Mrs. Jennings's medical records, his analysis proceeded based on the diagnoses and findings identified in those reports and records, and his opinions would have been the same had he not consulted Dr. Keyserling.  (Id. ¶¶ 8-9.)

Based on the foregoing, the Court finds Dr. Campbell did not rely on the subjective opinions of Dr. Keyserling in forming his expert report.  Essentially, Dr. Keyserling read Mrs. Jennings's written radiology reports, explained what they said to Dr. Campbell, and visually identified the same on the radiological imaging.  (Id. ¶ 7.)  In other words, Dr. Keyserling made no opinion about the radiological imaging himself, but merely explained to Dr. Campbell what was in Mrs. Jennings's written reports.  Because the Court finds Dr. Campbell's opinions are his own and are not a wholesale adoption of Dr. Keyserling's purported "subjective opinions," the Court will not exclude Dr. Campbell's testimony on this basis.  See Fox v. Gen. Motors LLC, No. 1:17-CV-209, 2019 WL 3483171, at *26 (N.D. Ga. Feb. 4, 2019)

16

("Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion.") (citation omitted).

### 2. Whether Dr. Campbell's Methodologies Are Testable

Next, Plaintiffs argue Dr. Campbell's testimony should be excluded because his methodology cannot be tested. (Doc. 37, at 1; Doc. 38, at 6-7.) Plaintiffs assert "Dr. Campbell's methodology cannot be tested because he relied upon a radiologist [Dr. Keyserling] who has not been identified as an expert and whose methods were not explained." (Doc. 38, at 6.) Defendants counter that Dr. Campbell's methodologies are testable because his "tests, modeling, and analysis are based [on] testing for injuries stated [in Mrs. Jennings'] medical records and radiology studies, and nothing within Plaintiff[s'] motion challenges this work performed by Dr. Campbell." (Doc. 45, at 11.) Again, the Court agrees with Defendants.

As discussed above, Dr. Campbell consulted Dr. Keyserling to better understand the facts of Mrs. Jennings's injuries, not to get his "subjective opinions," so the consultation with Dr. Keyserling does not make Dr. Campbell's methodologies unreliable. Furthermore, Dr. Campbell's expert report demonstrates his methodologies are, in fact, testable. Dr. Campbell conducted a biomechanical investigation of the Subject Incident, and his report laid out the objectives of his investigation. (Doc. 45-3,

at 1.)   Dr. Campbell lists the materials he reviewed, thoroughly explains some of them, and indicates the basis of his evaluations. (Id. at 1-13.)   Dr. Campbell's report thoroughly explains his biomechanical analysis, provides his conclusions, and explains how he reached them.   (Id. at 13-26, 28-29.)   Based on this, the Court finds Dr. Campbell's "methods and results were discernible and rooted in real science — i.e., were 'intellectually rigorous[] — [and thus] were empirically testable." Quiet Tech., 326 F.3d at 1346 (quoting Kumho Tire, 526 U.S. at 152).   As a result, the Court will not exclude Dr. Campbell's expert testimony on this basis.

   3. Whether Dr. Campbell Reliably Applied His Opinions to the Facts of This Case

   Finally, Plaintiffs argue Dr. Campbell's expert testimony should be excluded because he did not reliably apply his opinions to these facts.   (Doc. 54, at 8-9.)   Specifically, Plaintiffs contend Dr. Campbell's methodology is "flawed" in two ways.   (Id.) Plaintiffs contend the first flaw in Dr. Campbell's methodology is that "he fails to account for the presence and extent of the degenerative changes that existed in [Mrs.] Jennings's cervical and lumbar spine at the time of the [Subject Incident]."   (Id. at 8.)   They argue this is important because "[i]f an individual is more susceptible to injury because of pre-existing degenerative changes, the amount of force required to generate an injury should change."   (Id.)   Plaintiffs contend the second flaw in Dr.

Campbell's methodologies is that, because his opinions pertain to "someone similar" to Mrs. Jennings but not her specifically, Dr. Campbell is "unable to accurately apply his opinions to Mrs. Jennings' fall and injuries." (Id. at 9.)

Defendants did not respond to this argument. Nevertheless, the Court is not persuaded these alleged "flaws" make Dr. Campbell's methodologies unreliable such that he should be excluded from providing expert testimony. Plaintiffs' arguments, rather than demonstrate that Dr. Campbell's methodologies are unreliable, tend to go to whether Dr. Campbell's methodologies are accurate. But as the Court explained, it is not concerned with whether Dr. Campbell's proposed testimony is scientifically correct; it is only concerned with whether his testimony is reliable based on scientific principles and methodology. In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d at 1280 (citing Allison, 184 F.3d at 1312). For the reasons discussed above, the Court finds Dr. Campbell's methodologies reliable, and Plaintiffs' arguments that his methodologies did not produce the most accurate results are more appropriate for cross-examination. Based on the foregoing, Plaintiffs' motion to exclude the expert testimony of Dr. Campbell (Doc. 37) is **DENIED.**

**C. Defendants' Motion to Exclude Expert Testimony of Mr. Winter**

Defendants move, pursuant to Federal Rule of Evidence 702 and Daubert, to exclude certain testimony of Mr. Winter. (Doc. 46.)

Plaintiffs responded in opposition, and Defendants replied in support (Docs. 64, 70).

Mr. Winter is a professional engineer with a B.S. in Electrical Engineering. (Doc. 32-2, at 1; Doc. 46-4, at 8; Doc. 64-3, at 5.) He works for Robson Forensic, an expert consulting firm, and specializes in furniture failure investigations. (Doc. 32-2, at 1.) Aside from being a professional engineer, Mr. Winter is also a furniture maker. (Id.) Mr. Winter has his own workshop where he has constructed furniture, including chairs, for at least thirty years. (Id.) Mr. Winter testified he has also taken classes on constructing chairs and has "read everything that's been written about chairs." (Doc. 46-4, at 10.)

Mr. Winter lists the materials he considered to prepare his expert report, but his report largely relies on photographs of the Subject Chair and his experience as a woodworker and engineer. (Doc. 32-2, at 1-8.) Mr. Winter draws three conclusions: (1) the Subject Chair's "leg failed due to the lack of adhesive applied to the mortise and tenon joint"; (2) "[D]efendants failed to adequately inspect and test the [Subject C]hair," and, "[h]ad they done so, they would have discovered that the leg(s) were weakly attached, and the [Subject Incident] would not have occurred"; and (3) the Subject Chair "was unreasonably dangerously defective and unsuited for its intended purpose." (Id. at 8.)

Defendants move to exclude "Mr. Winter's opinions related to inspections of the chair by Defendants' employees." (Doc. 46, at 5.)   Specifically, Defendants seek to exclude Mr. Winter's testimony "that Defendants did not properly or reasonably inspect the [Subject C]hair prior to placing it on the sales floor" and "that a proper inspection would be for Defendants' employees to sit in every chair."[1]   (Id.)   Defendants argue Mr. Winter's testimony about the reasonableness of Defendants' employees' inspection of the Subject Chair should be excluded for three reasons: (1) Mr. Winter is not qualified to give such testimony; (2) the testimony merely parrots Plaintiffs' legal argument; and (3) his testimony would not help a jury because his opinions are within the knowledge and experience of a regular citizen. (Id. at 6–9.)

In response, Plaintiffs contend Mr. Winter is qualified to give such testimony because he based it on his "knowledge, experience and skill as an engineer and furniture expert." (Doc. 64, at 5.)   Moreover, Plaintiffs argue Mr. Winter's testimony is not a legal conclusion, but "provides the jury with relevant and helpful information that supports what a reasonable inspection entails." (Id. at 7–9.)   Finally, Plaintiffs argue Mr. Winter's testimony will help the jury determine whether "Defendants'

---

[1] Defendants "do[] not challenge Mr. Winter's opinions regarding why the chair broke or who created the chair's defect." (Doc. 46, at 5 n.1.)

limited visual inspection of the defective chair was acceptable." (Id. at 10.)

If Mr. Winter intends to testify about the reasonableness of the Subject Chair's inspection, the Court agrees he is unqualified to do so. Mr. Winter has no experience working in the back room or warehouse of a retail store aside from one job as a teenager. (Doc. 46-4, at 14.) Further, Mr. Winter has never worked for a retail store in a capacity in which he developed policies and procedures for inspecting merchandise. (Id. at 15-16.) Mr. Winter opined his qualifications to testify about retail safety inspection procedures stem from his experience "[o]n construction sites, in factories accepting equipment," and "as a forensic engineer." (Id.) While Mr. Winter links this experience to his ability to determine what condition a chair is in, what, if anything, broke, and whether those conditions were causally related to an injury, he does not link his experience to retail safety inspections. (Id.) As a result, the Court finds Mr. Winter unqualified to testify about the reasonableness of Defendants' inspection of the Subject Chair. See Anderson, 2014 WL 8103792, at *7 (citing Jones, 188 F.3d at 723).

The Court also finds it appropriate to exclude Mr. Winter's testimony on the reasonableness of Defendants' inspection of the Subject Chair and his testimony that the Subject Chair was "unreasonably dangerously defective and unsuited for its intended

purpose" because both are legal conclusions.  (Doc. 32-2, at 8.)

"An expert may testify as to his opinion on an ultimate issue of

fact.  An expert may not, however, merely tell the jury what result

to reach."  Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537,

1541 (11th Cir. 1990) (citations omitted).  Moreover, a witness

"may not testify to the legal implications of conduct; the court

must be the jury's only source of law."  Id. (citations omitted).

Based on the foregoing, as to any testimony by Mr. Winter that, in

his opinion, Defendants' inspection policy is "unreasonable" or

that the Subject Chair was "unreasonably dangerously defective and

unsuited for its intended purpose," the Court finds exclusion

appropriate.

The Court, however, disagrees with Defendants' motion to

exclude Mr. Winter's testimony that, in his opinion as a woodworker

and furniture expert, the best way to test a chair to ensure it is

safe is to sit in it.  To this end, the Court finds Mr. Winter is

qualified to give such testimony.  Mr. Winter has been building

furniture, including chairs, for thirty years.  (Doc. 46-4, at 9.)

Mr. Winter has attended courses in constructing chairs and has

"read everything that's been written about chairs."  (Id. at 10.)

Specific to this case, when asked whether he ever builds chairs

with mortise-and-tenon joints, like the Subject Chair, Mr. Winter

said, "Yes."  (Id. at 10-11.)  Furthermore, Mr. Winter testified

he has "probably built 10 to 12 chairs" with "mortise-and-tenon

joinery," and has even "broken a few intentionally to study . . .
the form." (Id. at 11.) Accordingly, the Court finds Mr. Winter
qualified to testify about chair safety in his capacity as a
woodworker and furniture expert. Moreover, so long as Mr. Winter
does not make the leap from testifying about chair safety to
concluding Defendants' employees' failure to sit in the chair
before putting it on the sales floor renders the employees'
inspection unreasonable, the Court does not find Mr. Winter's
testimony constitutes a legal conclusion.

Defendants also argue Mr. Winter's testimony on chair safety
does not help a jury because his opinions are within the knowledge
and experience of regular citizens. (Doc. 46, at 8-9.) To support
their argument, Defendants point to the following testimony from
Mr. Winter's deposition:

> [H]ow do determine [sic] that you've actually got that
> done? You need to sit in [the chair]. That's the best
> way I know of under the circumstances. You're not
> bringing it to a lab. Under the circumstances, sit in
> the chair and see if it feels solid.
>
> And we all know how to do this. At least, I do. My
> wife does. And I'm sure you've had this experience as
> well. You sit down in a chair and it's rickety. You
> say, "Hey. This is not right."

(Doc. 46, at 3 (quoting Doc. 46-4, at 34).) From this, Defendants
argue Mr. Winter's testimony should be excluded because it "shows
his opinions are based on what he believes regular, ordinary
persons do when they encounter chairs." (Doc. 46, at 8.)

24

or as otherwise provided by Federal Rule of Civil Procedure 56. FED. R. CIV. P. 56(c)(1).

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the parties specifically cite and legal arguments they expressly advance. See id.

In this action, the Clerk provided Plaintiffs notice of Defendants' summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 52.) The Clerk also provided Defendants notice of Plaintiffs' partial summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 51.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials has expired, the issues have been thoroughly briefed, and the motions are now ripe for consideration. In reaching its conclusions, the Court

31

Plaintiffs argue Mr. Winter's testimony will help the jury determine a fact in issue — namely, whether Defendants' visual inspect of the Subject Chair was acceptable — and thus should not be excluded on this basis. (Doc. 64, at 10.)

Under Rule 702, expert opinions must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). Expert testimony assists the trier of fact by explaining something that is "beyond the understanding of the average lay person." Jackson v. Catanzariti, No. 6:12-cv-113, 2019 WL 2098991, at * 7 (S.D. Ga. May 14, 2019) (citing Frazier, 387 F.3d at 1262). "Under [the helpfulness] requirement, which is concerned primarily with relevance, the Court must consider whether the expert testimony is sufficiently tied to the facts of the case that it will aid the factfinder in resolving a factual dispute." FP Augusta II, LLC v. Core Constr. Servs., LLC, No. CV 119-048, 2022 WL 626783, at *4 (S.D. Ga. Mar. 3, 2022) (alteration adopted) (citation and internal quotation marks omitted). Under Daubert, the proponent of the expert (in this case, Plaintiffs) bears the burden of demonstrating the expert's opinion "is relevant to the task at hand . . . i.e., that it logically advances a material aspect of the proposing party's case." Allison, 184 F.3d at 1306, 1312 (citation and internal quotation marks omitted).

As the Court explains in further detail below, to prevail on a negligent failure to warn claim, Plaintiffs will have to show

Defendants had either actual or constructive knowledge of the danger posed by the Subject Chair. See Williams v. Pac. Cycle, Inc., No. 1:13-CV-875, 2015 WL 11215854, at *7 (N.D. Ga. Oct. 19, 2015) (citing Farmer v. Brannan Auto Parts, Inc., 498 S.E.2d 583, 585 (Ga. Ct. App. 1998)). "Constructive knowledge may be established by showing either that: (1) an employee of the proprietor was in the immediate area of the hazard and had the means and opportunity to easily see and remove it; or (2) the proprietor failed to exercise reasonable care in inspecting the premises." Whatley v. Nat'l Servs. Indus., Inc., 492 S.E.2d 343, 345 (Ga. Ct. App. 1997) (citation omitted). "Constructive knowledge may be inferred when there is evidence that the owner lacked a reasonable inspection procedure." Gibson v. Halpern Enters., 655 S.E.2d 624, 626 (Ga. Ct. App. 2007) (citation omitted).

At trial, Plaintiffs will have to show Defendants' inspection procedures were unreasonable because they did not physically inspect the chair. (Doc. 64, at 10.) Therefore, Mr. Winter's testimony about the chair's safety is plainly relevant. Moreover, Mr. Winter opined the defect causing the Subject Chair's leg to break was a lack of adhesive in the mortise-and-tenon joint. (Doc. 46-4, at 16-17.) He also testifies the best and most obvious way to determine whether a chair has this defect is to sit in it. (Id. at 32-33.) The Court finds this testimony goes "beyond the

26

understanding of the average lay person" because the average lay person is unlikely to know the *best* way to determine whether a chair lacks adhesive in a mortise-and-tenon joint is to sit in it. See Catanzariti, 2019 WL 2098991, at *7 (citing Frazier, 387 F.3d at 1262). As this testimony will logically advance a material aspect of Plaintiffs' case, the Court finds excluding Mr. Winter's testimony inappropriate to the extent he wishes to testify as to the best method to test a chair with this defect. See Allison, 184 F.3d at 1312 (citation omitted).

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to exclude the testimony of Mr. Winter. (Doc. 46.) Mr. Winter is **EXCLUDED** from offering testimony and related opinions that the inspection of the Subject Chair conducted by Defendants' employees was unreasonable and that the Subject Chair "was unreasonably dangerously defective and unsuited for its intended purpose."

**D. Defendants' Motion to Exclude the Testimony of Ms. Fowler**

Defendants also move to exclude the testimony of Ms. Fowler. (Docs. 47.). Plaintiffs oppose this motion. (Doc. 63.) On March 19, 2024, the Parties filed a consent motion for a status conference to address the possibility of reopening discovery. (Doc. 77.) The Court granted the Parties' motion and held a status conference on June 4, 2024. (Docs. 78, 81.) At the status conference, the Court determined reopening discovery was

appropriate and directed the Parties to file a letter with the Court indicating which of their pending motions would be affected by this decision. (Doc. 81.) The Parties conferred and determined Defendants' motion to exclude the testimony of Ms. Fowler would be affected by the additional discovery period. (Doc. 82.) Because the Parties agree Defendants' motion will be affected by the extra discovery period, the Court finds the motion is not yet ripe for review. Accordingly, Defendants' motion to exclude the testimony of Ms. Fowler (Doc. 47) is **DENIED AS MOOT**. This does not prevent Defendants from refiling their motion upon completion of the additional discovery period, if appropriate.

### III. MOTIONS FOR SUMMARY JUDGMENT

On November 29, 2023, Defendants moved for summary judgment. (Doc. 50.) Plaintiffs responded in opposition, and Defendants replied in support. (Docs. 62, 71.) Also on November 29, 2023, Plaintiffs moved for partial summary judgment. (Doc. 48.) Defendants responded in opposition, and Plaintiffs replied in support. (Docs. 73, 76.) The Court addresses the motions in turn.

### A. Legal Standard

The Parties move for summary judgment under Federal Rule of Civil Procedure 56(a). (Docs. 48, 50.) Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a).  Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted), and must draw "all justifiable inferences in [its] favor."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways: by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and

that it is entitled to judgment as a matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet its burden at trial is insufficient.  Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  Fitzpatrick, 2 F.3d at 1116.  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  Id.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1116–17 (citations omitted).  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits

has evaluated the Parties' briefs, other submissions, and the evidentiary record.

## B. Defendants' Motion for Summary Judgment

Plaintiffs bring claims of (1) strict products liability, (2) negligent inspection, (3) premises liability, and (4) loss of consortium. (Doc. 1-2, ¶¶ 26-52.) Defendants move for summary judgment on all claims. (Doc. 50, at 1; Doc. 50-2, at 6-16.) The Court addresses each claim in turn.

### 1. Strict Products Liability

Plaintiffs assert a strict products liability claim under O.C.G.A. § 51-1-11. (Doc. 1-2, ¶¶ 37-47.) Defendants move for summary judgment, arguing it fails as a matter of law because they are retailers, not manufacturers. (Doc. 50-2, at 13-14.) Plaintiffs argue Defendants qualify as manufacturers under Georgia law because there is sufficient evidence to establish Defendants imported, licensed, and assembled the Subject Chair. (Doc. 62, at 19-22.)

Georgia's strict products liability statute provides:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

O.C.G.A. § 51-1-11(b)(1).   Thus, "to state a claim for strict liability, the plaintiff must show that (1) the defendant was the manufacturer of the product; (2) the product, when sold, was not merchantable and reasonably suited to the use intended; and (3) the product's defective condition proximately caused plaintiff's injury."  Whitehead v. Green, 879 S.E.2d 698, 710 (Ga. Ct. App. 2022) (alteration adopted) (citation and internal quotation marks omitted).   Georgia's strict liability statute does not define "manufacturer" for purposes of liability, so the Parties rely on the Northern District of Georgia's decision in Morgan v. Mar-Bel, Inc., 614 F. Supp. 438 (N.D. Ga. 1985).   See O.C.G.A. § 51-1-11; (Doc. 62, at 19; Doc. 71, at 9.)

In Morgan, the Northern District of Georgia found Georgia case law

> reveals three situations in which an entity is deemed a
> manufacturer for the purposes of strict liability:
> (a) an actual manufacturer or designer of the product;
> or
> (b) a manufacturer of a component part which failed and
> caused the plaintiff injury; or
> (c) an assembler of component parts who then sells the
> item as a single product under its own trade name.

614 F. Supp. at 440 (citations omitted).  Plaintiffs argue Defendants fit the third situation.   (Doc. 62, at 20-22.) Plaintiffs contend there is evidence Defendants (1) imported the Subject Chair, (2) licensed the Subject Chair, and (3) assembled the Subject Chair in the back room of the Store. (Id.)  Defendants

argue they do not fit the third Morgan situation because the only item they provided for the Subject Chair was the price tag; they did not provide any parts, make any design choices, or assemble any components. (Doc. 71, at 10.) The Court agrees Defendants are not manufacturers.

The Parties dispute whether the chair was assembled at the Store. (Doc. 50-1, ¶ 12; Doc. 62-1, ¶ 12.) Regardless, Defendants are only manufacturers under the third Morgan situation if they also sold the Subject Chair "under [their] own trade name." 614 F. Supp. at 440 (citations omitted). The Morgan court reasoned the defendant did not fit the third situation because it "did not assemble any component parts into a single product *nor did it sell or represent the* [*product*] *as its own*." Id. (emphasis added). The Parties do not dispute the Subject Chair was branded with a Nautica tag. (Doc. 50-1, ¶ 16; Doc. 62-1, ¶ 16.) Defendants sold the Subject Chair as a Nautica chair and did not represent it as a HomeGoods chair. See Morgan, 614 F. Supp. at 440. Nevertheless, Plaintiffs urge the Court to find Defendants sold the Subject Chair under their trade name because they "owned the license to affix the Nautica label to the [Subject Chair], sent the label in advance to [the Vietnamese Manufacturer], and imported the [Subject Chair] for sale." (Doc. 62, at 20-21.) These facts do not defeat the fact the Subject Chair was sold under the Nautica brand instead of

the HomeGoods brand.   Therefore, the Court finds Defendants are not "manufacturers" under applicable Georgia law.

Plaintiffs' argument that "Defendants' actions far exceed the definition of a product seller" under O.C.G.A. § 51-1-11.1(a) does not alter the Court's conclusion.   (Doc. 62, at 22–24.)   Even if true, that Defendants might not fit perfectly into the definition of "product seller" in O.C.G.A. § 51-1-11.1(a) does not mean they are "manufacturers" subject to strict liability under O.C.G.A. § 51-1-11(b)(1).   For the reasons explained above, the Court finds Defendants are not manufacturers under Georgia's strict products liability statute.   Because Plaintiffs cannot establish Defendants are manufacturers under O.C.G.A. § 51-1-11(b)(1), the Court finds their strict products liability claim fails as a matter of law, and Defendants' motion for summary judgment is **GRANTED** as to this claim.

## 2. Negligent Inspection

Plaintiffs allege Defendants conducted their Price-Point Inspection negligently, which resulted in damages.   (Doc. 1-2, ¶¶ 30, 32, 34-36.)   Defendants argue summary judgment is appropriate because, as retailers, they did not have a duty to test the Subject Chair for the Physical Defect.   (Doc. 50-2, at 7-9.)   Plaintiffs contend that, while Defendants may not have had a duty to inspect the Subject Chair for latent defects initially, Defendants assumed

such a duty when their employees conducted the Price-Point Inspection. (Doc. 62, at 15.)

"The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages." Wilcher v. Redding Swainsboro Ford Lincoln Mercury, Inc., 743 S.E.2d 27, 30 (Ga. Ct. App. 2013) (citation omitted). Thus, whether the defendant owes a legal duty to the plaintiff is the threshold issue in a negligence action and is a question of law. Id. (citation omitted). In Georgia, a retailer generally has no duty to inspect products "it purchases for resale for the purpose of discovering latent or concealed defects." Id. (citation omitted). However, if the retailer undertakes an inspection to discover latent or concealed defects, "it incurs a duty to conduct such inspection non-negligently." Id. (citation omitted).

The Court finds summary judgment on Plaintiffs' negligent inspection claim appropriate because they point to no evidence indicating Defendants inspected the Subject Chair "*for the purpose of discovering latent or concealed defects.*" Id. (emphasis added) (citation omitted). Plaintiffs argue that "Defendants assumed a duty of care once their employees attempted the [Price-Point] [I]nspection." (Doc. 62, at 15.) Plaintiffs contend this is so because "[a] necessary component [of the Price-Point Inspection] is . . . to identify defects." (Id.) But Plaintiffs do not argue

36

the purpose of the Price-Point Inspection is to uncover "latent or concealed defects." (See id.); Wilcher, 743 S.E.2d at 30 (citation omitted).  To support their argument that Defendants assumed a duty to inspect for latent defects, Plaintiffs cite three documents containing "Defendants' policies and procedures requir[ing] damaged and defective merchandise be reduced in price appropriately." (Doc. 62, at 15 (citing Docs. 62-14, 62-15, 62-16).) But as Defendants point out, the purpose of the Price-Point Inspection was to determine whether the Subject Chair had "readily apparent or discernable damage or defects" and to what extent its price should be reduced, not to determine whether the Subject Chair had any latent defects.  (Doc. 50-2, at 4, 10.)   While the documents Plaintiffs cite outline procedures for handling defective merchandise, none of them require Defendants' employees to conduct an inspection to uncover latent defects. (See Docs. 62-14, 62-15, 62-16.)  Moreover, Plaintiffs point to no evidence demonstrating Defendants' employees inspected the Subject Chair hoping to discover latent defects regardless of Defendants' inspection policies.

In short, Plaintiffs have not shown, or even argued, a genuine dispute of material fact exists as to whether Defendants' employees inspected the Subject Chair for the "purpose of discovering latent or concealed defects." (See Doc. 62); Wilcher, 743 S.E.2d at 30 (citation omitted).  As a result, they have not shown Defendants

37

had a duty to undertake such an inspection.  Therefore, Defendants'
motion for summary judgment is **GRANTED** as to Plaintiffs' negligent
failure to inspect claim.

### 3. Negligent Failure to Warn of Product Defect

Plaintiffs also allege Defendants were negligent in failing
to warn Plaintiffs of the Subject Chair's Physical Defect.  (Doc.
1-2, ¶¶ 30, 33.)  Defendants move for summary judgment because
they did not owe Plaintiffs a duty to warn of the Subject Chair's
defect since they had neither actual nor constructive knowledge of
the defect.  (Doc. 50-2, at 11–13.)  The Court agrees with
Defendants.

When selling allegedly defective products, "Georgia law
imposes a duty on a seller to warn only of dangers actually or
constructively known at the time of the sale."  DeLoach v. Rovema
Corp., 527 S.E.2d 882, 883 (Ga. Ct. App. 2000) (citation omitted).
Plaintiffs argue Defendants had a duty to warn them of the Subject
Chair's defect because Defendants had actual and constructive
knowledge of it.  (Doc. 62, at 18.)  Plaintiffs contend a question
of fact exists as to whether Defendants had actual knowledge of
the Subject Chair's defect because they reduced its price by 29%
before putting it on display.  (Id.)  Plaintiffs point to Mr.
Simons's testimony that, under Defendants' price reduction
policies, the price of merchandise with minor damage was reduced
up to 10%, the price of merchandise with "moderate damage" was

reduced up to 28.8%, and "if it is anything after that, [Defendants] really want it to be salvaged, disposed of." (Doc. 62, at 4, 13, 18; Doc. 50-14, at 32-33.) Plaintiffs argue that Defendants' reduction of the Subject Chair price by more than 28.8% suggests Defendants knew of the Subject Chair's Physical Defect, in addition to its Cosmetic Defect. (Doc. 62, at 13, 18.) Defendants argue the price reduction is not evidence they had actual knowledge of the Subject Chair's defect because: (1) knowledge of the Cosmetic Defect does not mean Defendants knew of the Physical Defect; (2) Defendants never listed the Subject Chair at the "compare to" price of $185.00, so that number is irrelevant in determining the price-reduction percentage; and (3) a price reduction from $129.99 to $100.00 is only a reduction of around 23%, so Plaintiffs' argument is factually incorrect. (Doc. 71, at 6-7.)

The Court agrees with Defendants. Mr. Simons testified he inspected the Subject Chair merely by looking at it after a colleague brought the Cosmetic Defect to his attention. (Doc. 50-14, at 59-60.) But Mr. Winter testified that someone conducting a visual inspection of the Subject Chair to determine whether it was properly constructed "may have [had] no clue [of the Physical Defect] to look at" and the Subject Chair "may have looked perfect to them." (Doc. 50-13, at 31.) Therefore, there is no evidence

39

Defendants' knowledge of the Cosmetic Defect constitutes knowledge of the Physical Defect.

The Court also finds Defendants' decision to reduce the Subject Chair's price does not demonstrate actual knowledge of the Subject Chair's Physical Defect. First, there is no evidence Defendants would have priced the Subject Chair at $185.00 if it had no defect, and Plaintiffs do not dispute this. (See Doc. 50-1, ¶ 16; Doc. 62-1, ¶ 16.) Therefore, the correct price to compare the reduced price to is the listed price of $129.99. (See id.) Although Plaintiffs argue to the contrary, a price reduction from $129.99 to $100.00 amounts to an approximately 23% change, not a 29% change. Plaintiffs' argument that Defendants' decision to reduce the Subject Chair's price demonstrates Defendants had actual knowledge of the Physical Defect is factually erroneous. As a result, the Court finds there is no evidence Defendants had actual knowledge of the Subject Chair's Physical Defect.

Plaintiffs also argue Defendants had constructive knowledge of the Subject Chair's Physical Defect. (Doc. 62, at 18.) Plaintiffs contend this is so "because a reasonable inspection would have uncovered the entire extent of the [Subject Chair's Physical Defect]." (Id.) Defendants argue their inspection was reasonable. (Doc. 50-2, at 11-13.) Both Parties cite authority demonstrating whether Defendants had a reasonable inspection procedure is relevant to determine whether they had constructive

knowledge in the *premises liability* context, which the Court discusses below.   (Doc. 50-2, at 11-12; Doc. 62, at 10-11; Doc. 71, at 4-5.)   But neither Party points the Court to any authority establishing whether a reasonable inspection policy is relevant for establishing constructive knowledge in the context of *negligent failure to warn of a product defect*.   And the Court is unaware of any authority establishing the same.   Moreover, although Defendants knew of the Subject Chair's Cosmetic Defect, Plaintiffs point to no evidence demonstrating the Cosmetic Defect was related to the Physical Defect.   Accordingly, since the Price-Point Inspection only revealed the Cosmetic Defect and there is no evidence it was related to the Physical Defect, the Court finds there is no evidence establishing Defendants had constructive knowledge of the Subject Chair's Physical Defect.   Without actual or constructive knowledge of the Subject Chair's Physical Defect, Defendants did not owe Plaintiffs a duty to warn them of it.   See DeLoach, 527 S.E.2d at 883 (citation omitted).   As a result, Defendants' motion for summary judgment is **GRANTED** as to Plaintiffs' negligent failure to warn claim.

### 4. Premises Liability

Plaintiffs also bring a premises liability claim.   (Doc. 1-2, ¶¶ 29, 33-36.)   Defendants argue summary judgment is appropriate because they did not have actual or constructive knowledge of the Subject Chair's Physical Defect.   (Doc. 50-2, at 11-13.)

41

"[T]he customer of a business is typically an invitee of the business owner . . . ." Cham v. ECI Mgmt. Corp., 856 S.E.2d 267, 276 n.13 (Ga. 2021) (citations omitted). "The owner or occupier of land is under a duty to invitees to discover and either keep the premises safe from or warn of hidden dangers or defects not observable to such invitees in the exercise of ordinary care." N.L. Indus., Inc. v. Madison, 336 S.E.2d 574, 577 (Ga. Ct. App. 1985) (citation omitted). To state a claim for negligence in a premises liability case, "an invitee must plead and prove two specific elements: (1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the defendant." Landrum v. Enmark Stations, Inc., 712 S.E.2d 585, 587 (Ga. Ct. App. 2011) (citations and internal quotation marks omitted). The Parties do not dispute the second prong, so the issue is whether Defendants had actual or constructive knowledge of the hazardous condition on their premises. Landrum, 712 S.E.2d at 587 (citations omitted). Plaintiffs argue Defendants had both actual and constructive knowledge. (Doc. 62, at 11–13.) Defendants contend they had neither. (Doc. 50-2, at 11-13; Doc. 71, at 4-8.) For the reasons explained above, the Court finds Defendants did not have actual knowledge of the hazardous condition at the Store. Thus, whether summary judgment is appropriate on

Plaintiffs' premises liability claim turns on whether Defendants had constructive knowledge.

In the premises liability context, "[c]onstructive knowledge may be inferred when there is evidence that the owner lacked a reasonable inspection procedure." Landrum, 712 S.E.2d at 588 (citation omitted). To prevail on summary judgment due to a lack of constructive knowledge, "the burden is upon [Defendants] to demonstrate not only that [they] had a reasonable inspection program in place, but that such program was actually carried out at the time of the incident." Id. (citations omitted). Plaintiffs contend Defendants did not have a reasonable inspection policy, and, if they did, they failed to carry it out. (Doc. 62, at 12.) Defendants argue their inspection policy was reasonable because "[s]tore employees inspected the [Subject C]hair when it was removed from the box," and then Mr. Simons inspected it "when he put it on a flat cart to go to the sales floor." (Doc. 71, at 5.) Moreover, Defendants assert "[a]ll store employees are charged with inspecting the sales floor continuously throughout their shifts to look for hazards, including inspecting furniture." (Doc. 50-2, at 4.) Even if true, and even if Defendants' premises inspection policy would otherwise be considered reasonable, the Court finds a genuine issue of material fact exists as to whether this policy was "actually carried out at the time of the incident." See Landrum, 712 S.E.2d at 588 (citations omitted).

Defendants cite no evidence establishing their employees carried out this policy around when the Subject Incident occurred. (See Docs. 50-2, 71.)   Indeed, when asked if he was aware of any policies or procedures requiring inspections of the Store's premises at certain periods of time, Mr. Simons answered: "No." (Doc. 50-14, at 45.)   Mr. Simons was also asked if any records were generated demonstrating employees inspected a certain section of the Store at a specific time, and he answered: "No.  If we did write that, that would be under the damage buster audit."   (Id.) Consequently, the Court finds a genuine dispute of material fact exists as to whether Defendants' premises inspection policy was carried out at the time of the Subject Incident, even if the Court assumes for ruling on Defendants' motion for summary judgment that their policy was reasonable.   See Landrum, 712 S.E.2d at 588 (citation omitted).

Citing Ballard v. Southern Regional Medical Ctr., Inc., 453 S.E.2d 123, 125 (Ga. Ct. App. 1995), Defendants argue whether they carried out a reasonable premises inspection policy is irrelevant because they do not have a "duty to discover a defect which has not manifested until the incident causing the injury." (Doc. 71, at 5.)   The Court, however, finds Ballard distinguishable from the facts here.   The Ballard court held that, although the defendant did not produce conclusive evidence it employed reasonable inspection procedures, summary judgment in the defendant's favor

44

was appropriate.   453 S.E.2d at 125.   The court concluded this because the plaintiff has the burden of proving at trial that the defect "existed for a sufficient amount of time to allow a reasonable inspection to discover it . . . to charge [the defendant] with constructive knowledge."   Id.   The Ballard plaintiff could not meet this burden because "there was an absence of evidence as to the period of time the [relevant defect] existed."   Id.

Here, however, there is evidence creating a genuine dispute of material fact as to how long the defect existed before the Subject Incident.   In his expert report, Mr. Winter states: "It is my conclusion that *the manufacturer failed to adequately apply adhesive to the leg tenons* rendering the [Subject C]hair defective and, as a result, the legs broke free and caused the [Subject C]hair to collapse."   (Doc. 50-10, at 7 (emphasis added).)   Thus, this case is distinguishable from Ballard because there is evidence creating a genuine dispute of material fact as to how long the Subject Chair's Physical Defect existed.   Based on the foregoing, the Court finds genuine disputes of material fact exist that preclude summary judgment on Plaintiffs' premises liability claim, so Defendants' motion for summary judgment on this claim is **DENIED**.

5. Loss of Consortium

Mr. Jennings also brings a claim for loss of consortium. (Doc. 1-2, ¶¶ 25, 50.)   Defendants move for summary judgment on

45

this claim.  (Doc. 50-2, at 14.)  As Defendants point out, "[o]ne spouse's right of action for the loss of the other's society or consortium is a derivative one, stemming from the right of the other."  (Id. (quoting Henderson v. Hercules, Inc., 324 S.E.2d 453, 454 (Ga. 1985)).)  Therefore, because Plaintiffs' premises liability claim survives summary judgment, Mr. Jennings's loss of consortium claim, being derivative of the premises liability claim, also survives.  Accordingly, Defendants' motion for summary judgment is **DENIED** as to Mr. Jennings's loss of consortium claim.

### 6. Conclusion

Based on the foregoing, Defendants' motion for summary judgment (Doc. 50) is **GRANTED** as to Plaintiffs' strict liability, negligent failure to inspect, and negligent failure to warn claims and **DENIED** as to Plaintiffs' premises liability and loss of consortium claims.

## C. Plaintiffs' Motion for Partial Summary Judgment

The Court now turns to Plaintiffs' motion for partial summary judgment.  (Doc. 48.)  Plaintiffs move for summary judgment on Defendants' seventh and tenth affirmative defenses.  (Id. at 1; Doc. 6, at 12-13.)  Defendants' seventh affirmative defense states: "Defendants . . . are not the manufacturer or distributor of the [Subject Chair] and Defendants put [P]laintiff on notice of the necessity of Nautica to be brought in as a party."  (Doc. 6, at 12.)  Defendants' tenth affirmative defense provides:

46

"Plaintiff[s'] injuries, if any, were caused by an unforeseeable intervening third party tortfeasor and/or the acts and failure to act of persons or entities other than Defendants." (Id. at 13.) Plaintiffs move for summary judgment on these affirmative defenses "[b]ecause Plaintiffs anticipate [Defendants] will attempt to avoid responsibility for Plaintiffs' injuries and damages by blaming the Vietnamese [M]anufacturer as a nonparty." (Doc. 49, at 6.) Plaintiffs argue summary judgment should be granted for two reasons: (1) the doctrine of judicial estoppel prevents Defendants "from asserting a third-party liability claim against the [Vietnamese M]anufacturer"; and (2) since Defendants' fault is indivisible, fault cannot be apportioned to a nonparty under O.C.G.A. § 51-12-33. (Id. at 7–16.) The Court addresses each argument in turn.

### 1. Judicial Estoppel

Plaintiffs first argue judicial estoppel prevents Defendants from asserting a third-party liability claim against the Vietnamese Manufacturer. (Doc. 49, at 13–16.) Preliminarily, the Parties seemingly dispute whether federal or state judicial estoppel law applies. (See Doc. 73, at 10; Doc. 76, at 4–5.) Defendants, pointing to federal law in the Eleventh Circuit, provide: "The Eleventh Circuit has established two elements for judicial estoppel. 'First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding.

47

Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system.'" (Doc. 73, at 10 (quoting <u>Salomon Smith Barney, Inc. v. Harvey</u>, 260 F.3d 1302, 1308 (11th Cir. 2001), *vacated on other grounds*, 537 U.S. 1085 (2002)).) Plaintiffs contend the standard from <u>Salomon</u> does not apply here because "judicial estoppel is controlled by state law, not federal law, in diversity cases." (Doc. 76, at 4.)

The Court agrees with Plaintiffs. Defendants invoked this Court's diversity jurisdiction by removing this case. (Doc. 1-1, at 1.) "In diversity cases, the application of the doctrine of judicial estoppel is governed by state law." <u>Searcy v. R.J. Reynolds Tobacco Co.</u>, 902 F.3d 1342, 1358 n.7 (11th Cir. 2018) (citation and internal quotation marks omitted). Thus, the Court applies Georgia judicial estoppel law rather than its federal counterpart, to the extent they differ.[2] See <u>id.</u>

"[J]udicial estoppel precludes a party from asserting a position in one judicial proceeding after having successfully asserted a contrary position in a prior proceeding." <u>D'Antignac v. Deere & Co., 804 S.E.2d 688, 691 (Ga. Ct. App. 2017)</u> (quoting <u>Period Homes v. Wallick</u>, 569 S.E.2d 502, 504 (Ga. 2002)). Georgia

---

[2] "Since 1994, Georgia courts have applied the federal doctrine of judicial estoppel." <u>D'Antignac v. Deere & Co.</u>, 804 S.E.2d 688, 691 (Ga. Ct. App. 2017) (citation omitted). However, as explained below, the Georgia courts adopted the standard set forth by the United States Supreme Court in <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750-51 (2001), which differs from the standard in <u>Salomon</u>. (<u>See</u> Doc. 73, at 10 (quoting <u>Salomon</u>, 260 F.3d at 1308)); <u>D'Antignac</u>, 804 S.E.2d at 691 (quoting <u>IBF Participating Income Fund v. Dillard-Winecoff, LLC</u>, 573 S.E.2d 58, 60 (Ga. 2002); citing <u>Maine</u>, 532 U.S. at 750-51).

courts consider these three factors to determine whether judicial estoppel applies:

> (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to accept the party's earlier position; absent success *in a prior proceeding*, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Id. (emphasis added) (quoting IBF, 573 S.E.2d at 60) (citing Maine, 532 U.S. at 750–51).

Plaintiffs contend judicial estoppel applies here. (Doc. 49, at 13–16.)   They argue Defendants' statement in response to Plaintiffs' motion for sanctions — that Defendants cannot assert a claim against the Vietnamese Manufacturer because pertinent video footage of the Store and the Subject Chair's broken leg were destroyed — conflicts with their seventh and tenth affirmative defenses, which "attempt to shift responsibility to the Vietnamese [M]anufacturer."   (Id. at 14.)   Defendants contend judicial estoppel does not apply because their positions are not inconsistent with one another.   (Doc. 73, at 11–12.)   The Court agrees with Defendants that judicial estoppel does not apply, albeit for a different reason: there is no evidence Defendants took an inconsistent position *in a prior proceeding*.   See D'Antignac, 804 S.E.2d at 691 (citations omitted).

As the Georgia Supreme Court explained, "judicial estoppel precludes a party from asserting a position in one judicial proceeding *after having successfully asserted a contrary position in a prior proceeding.*"   Wallick, 569 S.E.2d at 504 (emphasis added) (citation omitted).   Plaintiffs point to no evidence that Defendants have taken a position inconsistent with the positions they take in their seventh and tenth affirmative defenses in a prior judicial proceeding.   Nor do Plaintiffs cite to any controlling authority to establish that judicial estoppel could apply to inconsistent positions taken in two documents in the same judicial proceeding.[3]   Indeed, Plaintiffs acknowledge "judicial estoppel generally deals with two different court proceedings." (Doc. 49, at 15.)   Because Plaintiffs do not point to evidence from a prior judicial proceeding where Defendants took positions inconsistent with those taken in this proceeding, the Court finds judicial estoppel does not apply, and Plaintiffs' motion for partial summary judgment is **DENIED** on that ground.

### 2. Allocation of Fault to Nonparty

Plaintiffs also move for summary judgment on Defendants' seventh and tenth affirmative defenses because they believe

---

[3] Plaintiffs cite to Coca-Cola Co. v. Pepsi-Cola Co., 500 F. Supp. 2d 1364, 1378 (N.D. Ga. 2007) to support their argument that the Court should apply judicial estoppel here.   (Doc. 49, at 13, 15.)   However, this case held the opposite, because the Northern District of Georgia found judicial estoppel applicable because the defendant took an inconsistent position *in a prior case* before the court.   See Coca-Cola, 500 F. Supp. 2d at 1379.

Defendants will try to shift responsibility for Plaintiffs' injuries to the nonparty Vietnamese Manufacturer. (Doc. 49, at 6.) Plaintiffs argue summary judgment is appropriate because fault is indivisible between Defendants, so it cannot be apportioned to a nonparty under O.C.G.A. § 51-12-33. (Id. at 7-13; Doc. 76, at 2-4.) Defendants contend summary judgment is inappropriate on this issue because a question of fact exists as to whether fault between them is divisible. (Doc. 73, at 4-9.)

Georgia's apportionment statute provides:

(b) Where an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

(c) In assessing percentages of fault, the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit.

O.C.G.A. § 51-12-33(b)-(c).[4]

---

[4] "The Georgia General Assembly amended O.C.G.A. § 51-12-33, but the new version of the statute only applies to cases filed after May 13, 2022." Eliezer v. Mosley, 891 S.E.2d 555, 556 n.1 (Ga. Ct. App. 2023) (citations omitted). Plaintiffs filed this lawsuit in the State Court of Richmond County on February 25, 2022. (Doc. 1-2, at 1.) Therefore, the former version of O.C.G.A. § 51-12-33, quoted above, applies here. See Eliezer, 891 S.E.2d at 556 n.1 (citations omitted).

"As made clear in [Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC, 862 S.E.2d 295, 298-302 (Ga. 2021)], percentages of fault can be allocated to nonparties under [O.C.G.A.] § 51-12-33(c) only in cases where [O.C.G.A.] § 51-12-33(b) is applicable." Eliezer v. Mosley, 891 S.E.2d 555, 558 (Ga. Ct. App. 2023). Moreover, O.C.G.A. § 51-12-33(b) "is applicable in cases where there is more than one named defendant and fault is capable of division." Id. (citing Hatcher, 862 S.E.2d at 298-302; FDIC v. Loudermilk, 826 S.E.2d 116, 124-29 (Ga. 2019)). Here, there is more than one named Defendant, so the issue is whether "fault is capable of division." Id. (citations omitted). The Court finds it is not.

For fault to be "capable of division" such that O.C.G.A. § 51-12-33(b) applies, there must be a legal means of dividing fault among the named defendants. Id. at 558-59. In Eliezer, the plaintiff sued a dentist and his employer for dental malpractice. Id. at 556, 557. The plaintiff sought to recover against the employer "based solely on its status as [the dentist]'s employer under principles of vicarious liability and respondeat superior." Id. at 557. When the defendants filed a notice of intent to assess percentages of fault to three nonparty dentists the plaintiff also saw for treatment, the plaintiff moved to strike the notice, arguing fault was not divisible between the defendants because the employer's liability "was solely vicarious based on the acts and

omissions of [the dentist]." Id. The trial court ultimately granted the plaintiff's motion, finding fault was not divisible between the defendants, the apportionment statute did not apply, and there could be no allocation of fault to nonparties. Id. at 558. The Georgia Court of Appeals affirmed. Id. at 559. The court held "division of fault is not possible in cases predicated solely on the theory that one of the two named defendants is vicariously liable for the acts or omissions of the other named defendant under the doctrine of respondeat superior." Id. (citations omitted). The court also pointed out that the Georgia Supreme Court has found "apart from concerted action, there may exist other legal theories that preclude division of fault as a matter of law — perhaps, for instance, *vicarious liability* or other agency-based or derivative theories of liability." Id. (quoting Loudermilk, 826 S.E.2d at 129 n.20). For these reasons, the Georgia Court of Appeals concluded there was "no legal means of dividing fault among [the dentist and his employer]," so O.C.G.A. § 51-12-33(b) was inapplicable. Id. (citation omitted). Since O.C.G.A. § 51-12-33(b) did not apply, fault could not be allocated to nonparty dentists under O.C.G.A. § 51-12-33(c). Id. (citation omitted).

The Court finds this case is similar to Eliezer and concludes fault is indivisible between Defendants such that O.C.G.A. § 55-12-33(b) does not apply. Like the plaintiff in Eliezer, who

sought to recover against the dentist's employer solely based on theories of vicarious liability and respondeat superior, Plaintiffs' claims against TJX are based solely on theories of vicarious liability and respondeat superior. (Doc. 1-2, ¶ 8; Doc. 49, at 11-13); Eliezer, 891 S.E.2d at 557.  Therefore, applying Eliezer to this case, the Court finds O.C.G.A. § 55-12-33(b) does not apply because there is no legal means to divide fault between Defendants, given that Plaintiffs seek to recover against TJX solely on the bases of vicarious liability and respondeat superior, which are derivative bases of liability. (See Doc. 1-2, ¶ 8; Doc. 49, at 11-13); Eliezer, 891 S.E.2d at 559.  Because O.C.G.A. § 55-12-33(b) does not apply, fault cannot be apportioned to a nonparty under O.C.G.A. § 55-12-33(c) either.  See Eliezer, 891 S.E.2d at 559.

Defendants urge the Court to reach a different conclusion, arguing that merely pleading claims against two corporate defendants does not support granting Plaintiffs summary judgment because such pleading "does not amount to evidence that the corporations are vicariously liable for each other's negligence." (Doc. 73, at 5.)  The Court disagrees.  While there may be issues of fact concerning whether TJX can be vicariously liable for HomeGoods's alleged wrongdoing, this does not matter for purposes of determining whether fault between Defendants "is *capable* of division."  Eliezer, 891 S.E.2d at 558 (emphasis added) (citing

Hatcher, 862 S.E.2d at 298-302; Loudermilk, 826 S.E.2d at 124-29). Both the Georgia Supreme Court and the Georgia Court of Appeals have made clear that it is the *legal theory itself* that determines whether fault is capable of division between named defendants, not whether the legal theory may be proven at trial.  See Eliezer, 891 S.E.2d at 559; Loudermilk, 826 S.E.2d at 129 n.20.

Defendants cite Kissun v. Humana, Inc., 479 S.E.2d 751 (Ga. 1997), for the proposition that the relationship between a parent company, like TJX, and its wholly owned subsidiary, like HomeGoods, precludes liability based on theories of vicarious liability and respondeat superior.  (Doc. 73, at 6-7.)  But the Court disagrees the Georgia Supreme Court reached such a conclusion in that case. Rather, the Kissun court left open the possibility that a parent company and its subsidiary *could* establish a principal-agent relationship.  479 S.E.2d at 752.  Therefore, the Court finds Defendants' argument unpersuasive.

Because Plaintiffs' claims against TJX are based on theories of vicarious liability and respondeat superior, fault cannot be apportioned between Defendants under O.C.G.A. § 51-12-33(b).  See Eliezer, 891 S.E.2d at 559.  And since O.C.G.A. § 51-12-33(b) does not apply, Defendants cannot rely on O.C.G.A. § 51-12-33(c) to apportion fault to a nonparty.  See id.  As a result, Plaintiffs' motion for partial summary judgment is **GRANTED** to the extent

Defendants' seventh and tenth affirmative defenses seek to apportion fault to a nonparty.

### IV. MOTION FOR SANCTIONS

Finally, the Court turns to Plaintiffs' motion for sanctions. (Doc. 39.)   Plaintiffs ask the Court to impose sanctions on Defendants for spoliating evidence, particularly: (1) electronically stored information ("ESI") in the form of video footage; and (2) physical evidence in the form of the Subject Chair's broken leg.   (Id. at 1.)   Plaintiffs ask the Court to sanction Defendants by excluding the opinions of any biomechanical and causation experts Defendants offer and providing an appropriate adverse inference instruction to the jury at trial. (Id. at 2; Doc. 40, at 24–25.)   Defendants oppose Plaintiffs' motion.   (Doc. 43.)   The Court outlines the legal standards governing spoliation generally.   Next, the Court addresses the arguments concerning the surveillance footage of the Store. Finally, the Court turns to the arguments on the Subject Chair's broken leg.

### A. Legal Standards

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 F. App'x 298, 301 (11th Cir. 2009)

56

(citation omitted).   The standard for determining whether sanctions should be imposed for spoliating evidence depends on whether the evidence was physical evidence or ESI.  Polk v. Gen. Motors, LLC, No. 3:20-CV-549, 2024 WL 326624, at *17 (M.D. Fla. Jan. 29, 2024).   Although the legal standards differ, sanctions can be imposed only if the nonmoving party had a duty to preserve the disputed evidence in the first place.   See FED. R. CIV. P. 37 advisory committee's note to 2015 amendments ("Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve.   The rule does not apply when information is lost before a duty to preserve arises."); Ala. Aircraft Indus., Inc. v. Boeing Co., No. 20-11141, 2022 WL 433457, at *14 (11th Cir. Feb. 14, 2022) ("[T]he duty to preserve arises when litigation is 'pending or reasonably foreseeable' at the time of the alleged spoliation." (citations omitted)).

"The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence . . . ." Ala. Aircraft Indus., Inc. v. Boeing Co., 319 F.R.D. 730, 740 (N.D. Ala. 2017) (citing Graff, 310 F. App'x at 301).   In determining when a duty to preserve evidence arises, it is appropriate to consider a party's statements about the anticipation of litigation.   See Ala. Aircraft Indus., 2022 WL 433457, at *14.

## B. Surveillance Video

The Court first lays out the legal standard applicable for spoliation of ESI and then addresses the merits of the motion.

### 1. Standard for Spoliation of ESI

Federal Rule of Civil Procedure 37(e) governs the procedures and sanctions available when a party spoliates ESI. Under Rule 37(e), sanctions can be imposed only if: (1) "[ESI] that should have been preserved in the anticipation or conduct of litigation [wa]s lost because a party failed to take reasonable steps to preserve it"; and (2) that information "cannot be restored or replaced through additional discovery." FED. R. CIV. P. 37(e).

Rule 37(e) establishes two tiers of sanctions, "with lesser sanctions under Rule 37(e)(1) and more severe sanctions under Rule 37(e)(2)." Skanska USA Civ. Se. Inc. v. Bagelheads, Inc., 75 F.4th 1290, 1311 (11th Cir. 2023). Under Rule 37(e)(1), sanctions should only be imposed "where lost electronic evidence causes prejudice to another party," in which case sanctions should be "no greater than necessary to cure the prejudice." Id. (citation and internal quotation marks omitted). Thus, Rule 37(e)(1) focuses on the "effect of a violation." Id. The Federal Rules of Civil Procedure give courts discretion to allocate the burden of proving or disproving prejudice for purposes of Rule 37(e)(1). See FED. R. CIV. P. 37(e)(1) advisory committee's note to 2015 amendment.

The Court finds it appropriate to require Plaintiffs, as the moving Parties, to prove prejudice. There has been extensive fact discovery, and Plaintiffs could have explored the potential destruction of evidence, the likely content of any missing information, and any harm arising from the destruction of that evidence. See Silverstein v. Boehringer Ingelheim Pharms., Inc., No. 19-CIV-81188, 2020 WL 13119102, at *6-7 (S.D. Fla. Aug. 5, 2020) (discussing the allocation of the burden and facts bearing on whether to impose the burden on the moving party).

Sanctions under Rule 37(e)(2) should be imposed only upon finding the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." "[T]he 'intent to deprive another party of the information's use in the litigation' is the equivalent of bad faith in other spoliation contexts." Skanska, 75 F.4th at 1312 (citation omitted). In cases of spoliation, the Eleventh Circuit understands bad faith to "generally mean[] destruction of evidence *for the purpose of hiding adverse evidence.*" Id. (alteration adopted) (citation and internal quotation marks omitted). This standard requires "more than negligence or even gross negligence." Id. (citation omitted). Rule 37(e)(2) sanctions "do[] not require any further finding of prejudice." FED. R. CIV. P. 37(e)(2) advisory committee's note to 2015 amendment. Moreover, Rule 37(e)(2) sanctions include

"adverse jury instructions, and even dismissal or default judgment." Skanska, 75 F.4th at 1311 (citation omitted).

　　2. Discussion

　　Plaintiffs move the Court, under both Rule 37(e)(1) and (2), to sanction Defendants for failing to preserve surveillance footage of the Store related to the Subject Chair. (Doc. 40, at 9-16.) Plaintiffs assert Defendants should have preserved video footage of the entire Store, including where the Subject Incident occurred, and the back room where the Subject Chair may have been assembled. (Doc. 53, at 1-2, 5.) Plaintiffs ask the Court to sanction Defendants by (1) excluding any expert testimony Defendants offer as to the mechanism of injury and causation, and (2) providing an adverse inference instruction at trial. (Doc. 39, at 2; Doc. 40, at 22.) Although Defendants do not dispute the video surveillance footage Plaintiffs request was destroyed under their normal video retention policy, Defendants argue sanctions are inappropriate under Rule 37(e)(1) because: (1) Plaintiffs have not shown Defendants had a duty to preserve the video footage of the back room; and (2) Plaintiffs have not been prejudiced by the loss of the video footage of the Store. (Doc. 43, at 5-11, 12-14.) Further, Defendants contend sanctions are inappropriate under Rule 37(e)(2) because they did not dispose of the video footage in bad faith. (Id. at 11-12, 15.)

Preliminarily, the Court notes that, in analyzing whether sanctions should be imposed under Rule 37(e)(1) or (2), Defendants break up the video footage Plaintiffs requested into three categories: (1) the video footage of the Subject Incident; (2) the video footage of the rest of the Store's sales floor on the day of the Subject Incident; and (3) the video footage of the back room. (Id. at 8-15.)   Plaintiffs argue this is improper, "as the impact of . . . Defendants' spoliation is cumulative, not distinct." (Doc. 53, at 1-2.)   Thus, Plaintiffs urge the Court to view the video footage together "as a whole" in determining whether sanctions are appropriate under Rule 37(e).   (Id. at 2.) Plaintiffs cite no legal authority for this proposition.

Nevertheless, the Court agrees with Plaintiffs in part.   As the Court explains below, the video footage of where the Subject Incident occurred and the video footage of the rest of the Store's sales floor must be considered together to understand the context of Defendants' alleged spoliation.   But the Court finds Defendants' alleged spoliation of the video footage of the back room should be analyzed separately.   Plaintiffs do not explain how the video footage of the back room is in any way related to the video footage of the Store's sales floor, or how viewing the video footage of the back room would provide relevant context for the video footage of the Store's sales floor.   (See Doc. 53, at 1-4.)   Therefore, the Court analyzes whether Defendants should be sanctioned under

Rule 37(e) for their alleged spoliation of the video footage of the back room separately from their alleged spoliation of the video footage of the Subject Incident and remainder of the Store's sales floor.

a. <em>Alleged Spoliation of Video Footage of Back Room</em>

The Court finds sanctioning Defendants for losing the video footage of the back room is inappropriate under both Rules 37(e)(1) and (2) because Plaintiffs have not shown Defendants had a duty to preserve this footage. Sanctions can only be imposed under Rule 37(e)(1) or (2) if Defendants had a duty to preserve the video footage of the backroom. See FED. R. CIV. P. 37 advisory committee's note to 2015 amendments. Plaintiffs contend Defendants' duty to preserve the video footage of the back room arose at the earliest when the Subject Incident happened and at the latest when Defendants received Plaintiffs' Preservation Letter. (Doc. 40, at 11.) However, as Defendants point out, no evidence shows when the Subject Chair was delivered to the Store. (Doc. 43, at 9.) Plaintiffs do not respond to this argument or point to any evidence establishing video footage of the Subject Chair being delivered and unboxed in the back room existed at the time of the Subject Incident.

Plaintiffs assert that, although he never investigated or reviewed the video footage from the back room, Mr. Childs "confirmed that surveillance existed in an area where the chair

involved [in Mrs.] Jennings'[s] injury was possibly assembled and inspected."   (Doc. 40, at 12 (citation omitted).)   Mr. Childs testified that, unless it was in one of the back room's blind spots, there would have been video footage of the Subject Chair being delivered and unboxed in the back room at some "point in time."   (Doc. 40-7, at 36-37.)   But this testimony does not establish *when* the Subject Chair arrived at the Store.   Without such evidence, the Court finds Plaintiffs have not shown Defendants had a duty to preserve video footage of the back room at the earliest point such duty could have arisen — when the Subject Incident occurred.   Accordingly, sanctions under Rule 37(e)(1) and (2) are inappropriate as to the back room.   See FED. R. CIV. P. 37 advisory committee's note to 2015 amendments.

b. *Video Footage of the Store's Sales Floor*

The Court now turns to Plaintiffs' motion for sanctions for Defendants' alleged spoliation of the video footage of the Store's sales floor.   Analyzing spoliation of the video footage of the Subject Incident separately from the video footage of the rest of the Store's sales floor, Defendants argue Rule 37(e) sanctions are inappropriate for their failure to preserve the video footage of the Subject Incident because it happened in a blind spot, and "Plaintiffs cannot show that they were prejudiced by the destruction of alleged surveillance video that did not exist."   (Doc. 43, at 8.)   Defendants also conclude Rule 37(e) sanctions

are inappropriate for their failure to preserve video footage of the rest of the Store's sales floor because what Mrs. Jennings did in other areas of the store leading up to the Subject Incident is irrelevant. (Id. at 12.)  But, as Plaintiffs point out, without footage of the rest of the Store's sales floor, neither Plaintiffs nor the Court can examine the video footage and independently conclude the footage of the Subject Incident does not exist. (Doc. 53, at 3-4.)  Because reviewing video footage of the rest of the Store's sales floor would aid Plaintiffs and the Court in determining whether video footage of the Subject Incident existed, the Court finds the video footage of the rest of the Store's sales floor is relevant. See Mendez v. Wal-Mart Stores E., LP, 67 F.4th 1354, 1362 (11th Cir. 2023) (concluding, only after reviewing video footage "from the camera in question" that was recorded one hour before the plaintiff's fall, the plaintiff was not prejudiced from the destruction of video footage at the time of her fall because the camera was not positioned such that it would have captured her fall).  Without being able to independently examine the video footage of the rest of the Store's sales floor, the Court declines to hold that video footage of the Subject Incident does not exist. See id.

Defendants contend Plaintiffs' requested sanctions are inappropriate because "there is no evidence that Defendants destroyed the alleged video evidence in a manner inconsistent with

their normal video retention policies." (Doc. 43, at 15.) Plaintiffs disagree, contending the Court can infer Defendants intended to deprive them of the video footage of the Store's sales floor because: (1) Defendants are sophisticated parties that "understand the importance of preservation and retention policies"; and (2) "Defendants anticipated litigation well within their retention policy, and yet, for months took no steps to preserve the [S]tore's surveillance for trial," so they are not immune from sanctions because they passively followed their retention policy. (Doc. 40, at 15–16; Doc. 53, at 7.)

The Court agrees with Plaintiffs. Defendants are sophisticated parties, and, as such, should appreciate the need to preserve evidence that may be used in reasonably foreseeable future litigation. See Skanska, 75 F.4th at 1313–14. Moreover, the circumstances surrounding the spoliation of the video footage of the Store's sales floor suggest Defendants disposed of the video footage in bad faith. The Subject Incident occurred on March 7, 2020. (Doc. 50-1, ¶ 1; Doc. 62-1, ¶ 1.) Mr. Childs reviewed the video footage taken at the Store around the time of the Subject Incident. (Doc. 40-7, at 33.) Plaintiffs sent Defendants the Preservation Letter, which Defendants received on May 6, 2020. (Doc. 40-1, at 1; Doc. 40-2, at 3; Doc. 40-3, at 2.) However, according to Mr. Childs, at no point, even six to eight months after the Subject Incident, did anyone ever ask him to preserve

this footage.  (Doc. 40-7, at 43.)  Since it was not preserved, it was destroyed under Defendants' retention policy.  (Id. at 41.)

Defendants' reliance on their routine retention policy does not shield them from sanctions under Rule 37(e)(2).  Indeed, the Eleventh Circuit has noted "a hands-off implementation of an ordinary corporate destruction policy is not a silver bullet." Skanska, 75 F.4th at 1313.  The Eleventh Circuit has explained it "would be highly skeptical of a claim that evidence was unintentionally destroyed pursuant to a routine policy after a request that the evidence be preserved."  Id. (citation and internal quotation marks omitted).  Yet that is exactly what Defendants claim here.  (Doc. 43, at 15.)  And as the Eleventh Circuit expressed in Shanska, th Court is highly skeptical of Defendants' reliance on their routine retention policy under these circumstances. 75 F.4th at 1313.  Therefore, the Court finds the evidence suggests Defendants disposed of the video footage of the Store's sales floor "with the intent to deprive" Plaintiffs from using it in the litigation. FED. R. CIV. P. 37(e)(2).  As a result, Plaintiffs' motion for sanctions is **GRANTED** as to their request for sanctions for the loss of the video footage of the Store's sales floor, and the Court will provide the jury with an appropriate adverse inference instruction at trial.  See FED. R. CIV. P. 37(e)(2)(B).  Because the Court finds this sanction sufficient to resolve the harm done to Plaintiffs, Plaintiffs'

motion for sanctions is **DENIED** to the extent they ask the Court to exclude any expert testimony Defendants offer as to the mechanism of injury or causation.

## C. Subject Chair's Broken Leg

Plaintiffs also move the Court to sanction Defendants because they failed to preserve the Subject Chair's broken leg. (Doc. 40, at 16–22.)

### 1. Standard for Spoliation of Physical Evidence

Federal law also governs imposing sanctions for spoliation of physical evidence. Tesoriero v. Carnival Corp., 965 F.3d 1170, 1184 (11th Cir. 2020) (citation omitted)). Sanctions for spoliation of physical evidence include: "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." Id. (citation omitted). In determining whether to impose sanctions, the Court considers these factors:

> (1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed.

Id. (citation omitted).[5]

Although the Court may impose an adverse inference instruction as a sanction for spoliation of physical evidence, it

---

[5] The Court refers to these factors as the "Tesoriero factors."

can only do so upon finding the spoliating party acted in bad faith. See id. (citation omitted). As the Eleventh Circuit noted in Tesoriero, "bad faith in the context of spoliation generally means destruction for the purpose of hiding adverse evidence. This consideration is key in evaluating bad faith because the [spoliating] party's reason for destroying evidence is what justifies sanctions (or the lack thereof)." Id. (citation omitted). Indeed, "[m]ere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." Id. (citation omitted).

If the Court determines sanctions should be imposed, it has broad discretion in determining the appropriate sanction. See Ala. Aircraft Indus., 319 F.R.D. at 739 (quoting Flury, 427 F.3d at 944)).

2. Discussion

Again, Plaintiffs request that the Court sanction Defendants by (1) excluding any expert testimony Defendants may offer as to the mechanism of injury and whether Mrs. Jennings's fall caused her injuries, and (2) providing the jury an adverse inference instruction at trial. (Doc. 39, at 2; Doc. 40, at 22.) Plaintiffs argue sanctions are appropriate because each of the Tesoriero factors supports imposing sanctions, and they have shown Defendants acted in bad faith. (Doc. 40, at 16-22; Doc. 53, at 8-10.) Plaintiffs contend Defendants disposed of the Subject

68

Chair's broken leg in bad faith because: (1) Defendants maintained sole possession of it; and (2) it was disposed of at some point after it was sent to Defendants' insurance carrier even though they specifically requested Defendants preserve the Subject Chair in their Preservation Letter. (Doc. 40, at 7; Doc. 53, at 8-9.) Defendants disagree, arguing the <u>Tesoriero</u> factors weigh against the imposition of sanctions, and their disposal of the Subject Chair's broken leg resulted from mere negligence, not bad faith. (Doc. 43, at 15-22.)

The Court finds an adverse inference sanction appropriate because the Court agrees the evidence suggests Defendants disposed of the Subject Chair's broken leg in bad faith. Mr. Simons, the Store's manager, testified that, after the Subject Incident occurred, he gathered the pieces of the Subject Chair and put them in the Store's loss prevention office under direction from Defendants' insurance carrier. (Doc. 43-2, at 81-82.) Mr. Simons further testified that no portion of the Subject Chair was disposed of at that time, and all four of the Subject Chair's legs were boxed up before the box was transported to Defendants' insurance carrier. (<u>Id.</u> at 82-83.) Defendants do not dispute they maintained exclusive possession of the Subject Chair after the Subject Incident occurred. (Doc. 40-3, at 3-4.) Moreover, Defendants admit they received Plaintiffs' Preservation Letter on May 6, 2020. (<u>Id.</u> at 2; <u>see also</u> Doc. 40-1, at 1, 3; Doc. 40-2,

at 3.)  However, Defendants do not dispute that, at some point, the Subject Chair's broken leg went missing while in their sole possession.  (Doc. 40-3, at 3-4.)

Again, to determine whether sanctions are appropriate the Court considers (1) prejudice to the party seeking sanctions and whether such prejudice can be cured, (2) the practical importance of the evidence, (3) bad faith on behalf of the spoliating party, and (4) the potential for abuse if sanctions are not imposed. Tesoriero, 965 F.3d at 1184 (citation omitted).  Even if the first three factors were to weigh against imposing sanctions, the Court finds them outweighed by the fourth factor — the potential for abuse if sanctions are not imposed.  Id.  Defendants do not dispute they, either themselves or their insurance carrier, had sole possession of the Subject Chair after the Subject Incident.  (Doc. 40-3, 3-4.)  But because the leg was lost in transit between Defendants and their insurance carrier, Defendants argue this evidence establishes mere negligence on their behalf, not bad faith.  (Doc. 43, at 18.)  However, the Eleventh Circuit has indicated it is "highly skeptical" of situations where, as here, evidence was allegedly lost after the opposing party requested it be preserved.  See Tesoriero, 965 F.3d at 1186.  Because both Defendants and their insurance carrier share an incentive to limit their liability under the insurance policy, the Court is highly skeptical that Defendants did not act in bad faith in destroying

evidence of the broken chair leg. This is especially troubling given it is unlikely the opposing party will be able to uncover direct evidence of bad faith, which creates the potential for abuse by potential future defendants and their insurance carriers as well. Therefore, the Court finds the evidence suggests Defendants disposed of the broken leg in bad faith, not by mere negligence, so sanctions are appropriate.

Based on the foregoing, Plaintiffs' motion for sanctions is **GRANTED** as to their request for sanctions for the loss of the Subject Chair's broken leg, and the Court will provide the jury with an appropriate adverse inference instruction at trial. Because the Court finds this sufficient to resolve the harm, Plaintiffs' motion for sanctions is **DENIED** to the extent they request the Court exclude any expert testimony Defendants may offer on the mechanism of injury or causation.

### D. Conclusion

For the foregoing reasons, the Court will sanction Defendants in the form of an appropriate adverse inference instruction to the jury for their failure to preserve (1) the video footage of the Store's sales floor from the day of the Subject Incident and (2) the Subject Chair's broken leg. Although Plaintiffs request such sanctions, they do not provide exactly what the adverse inference instructions should be. (See Docs. 40, 53.) The Court will

determine the appropriate adverse inference instructions in preparation of trial, with input from the Parties.

### V. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' motion to exclude the opinion testimony of Ian Campbell, Ph.D., P.E. (Doc. 37) is **DENIED**; Plaintiffs' motion for sanctions (Doc. 39) is **GRANTED IN PART AND DENIED IN PART**; Defendants' motion to exclude certain opinions of Les Winter (Doc. 46) is **GRANTED IN PART AND DENIED IN PART**; Defendants' motion to exclude opinions of Harriet Fowler (Doc. 47) is **DENIED AS MOOT**; Plaintiffs' motion for partial summary judgment (Doc. 48) is **GRANTED IN PART AND DENIED IN PART**; and Defendants' motion for summary judgment (Doc. 50) is **GRANTED IN PART AND DENIED IN PART**. Because Plaintiffs' negligence claim survives summary judgment to the extent it asserts a premises liability claim, this case **SHALL** proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of September, 2024.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA